**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ROBERT SCOTT BATCHELAR** | : | **Civil Action No.** |
| **Individually and on behalf of all** | : | |
| **others similarly situated,** | : | **3:15-CV-01836 (VLB)** |
| | : | |
| **Plaintiff** | : | |
| **vs.** | : | |
| **INTERACTIVE BROKERS, LLC, :** | : | |
| **INTERACTIVE BROKERS GROUP,** | : | |
| **INC.,  and THOMAS A. FRANK** | : | **November 30, 2018** |
| | : | |
| **Defendants.** | : | |

<u>**NOTICE OF FILING SECOND AMENDED COMPLAINT**</u>

Pursuant to this Court's order of November 1, 2018, that the plaintiff file an amended compliant on or before November 30, 2018 (68), the plaintiff hereby files his second amended complaint, attached to this notice.

Respectfully submitted,

/s/ William M. Bloss
**William M. Bloss (ct01008)**
**Christopher M. Mattei (ct27500)**
**KOSKOFF, KOSKOFF & BIEDER, P.C.**
**350 FAIRFIELD AVENUE**
**BRIDGEPORT, CT 06604**
**Tel: (203)336-4421**
**Fax: (203)368-3244**
**Email: bbloss@koskoff.com**
**Email: cmattei@koskoff.com**
**Email: mkoskoff@koskoff.com**

**Gary N. Reger (tsb no. 16733200)**
**Orgain, Bell and Tucker, LLP**
**98 San Jacinto Blvd., Suite 1400**
**Austin, TX 78701**
**Tel: (512)861-0441**
**Email: gnr@obt.com**
**Counsel for Plaintiff**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Robert Scott Batchelar** | : | **Civil Action No.** |
| **Individually and on behalf of all** | : | |
| **others similarly situated,** | : | **3:15-CV-01836 (VLB)** |
| | : | |
| **Plaintiff** | : | |
| **vs.** | : | |
| **INTERACTIVE BROKERS, LLC, :** | : | |
| **INTERACTIVE BROKERS GROUP,** | : | |
| **INC.,** | : | |
| **and THOMAS A. FRANK:** | : | |
| | : | |
| **Defendants.** | : | |

### SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Robert Scott Batchelar Individually and on behalf of all others

similarly situated, for claims against Defendants Interactive Brokers, LLC ("IB"),

Interactive Brokers Group, Inc. ("IBG"), and Thomas A. Frank ("Frank"), complain

and allege as follows:

Introduction

1.  Imagine if you authorized your human broker to liquidate your

    account to reduce losses.  Then imagine that the human broker sold

    your investments in trades at prices below the then prevailing market

    price, at one point making a trade for an equivalent value of 12 cents

    on the dollar.  He did this despite knowing that there were buyers

    willing to pay dollar-for-dollar at the true, better market price

1

prevailing at the time the orders were generated. That is our case, with one exception.

2.      The difference is that in our hypothetical a human broker made the decision to sell below market, but in our actual case this resulted from the programming flaw in IB's Auto-Liquidation Software.[1] Here, there is civil liability in negligence, because in our case the loss was caused by negligence in the design, coding, testing and maintenance of the Auto-Liquidation Software.

3.      Exhibit A shows all the liquidation trades made by Defendants' Auto-Liquidation Software on behalf of Plaintiff compared with all trades made by third-parties trading the same positions as Plaintiff over the same period as Plaintiff's liquidation. <u>Because Plaintiff held a short position in the liquidated security, a higher price is bad for Plaintiff and a lower price is good for Plaintiff.</u> As illustrated in Exhibit A nearly all the liquidation trades were executed at prices far inferior to the market prices paid nearly simultaneously by third-parties.

---

1 Plaintiff uses the term Auto-Liquidation Software to mean the programs, instructions, code, subroutines, algorithms, called functions and other information however denominated that was designed, written, coded, tested, maintained or used to monitor customer margin accounts, determine if a margin deficiency exists in those accounts, and  liquidate assets held in margin accounts after a margin deficiency has been determined.

4.      Defendants admit that the Auto-Liquidation Software was intended to protect the customer from excessive losses. Because of negligence in the design, coding, testing and maintenance, the Auto-Liquidation Software instead caused losses that would not have occurred absent the negligent conduct alleged by Plaintiff.

5.      Had IB's software liquidated all of Plaintiff's position at the worst price obtained in the 51 liquidation trades that its software executed ($83.40, Exhibit A), which Defendants claim IB had the right to do, then Plaintiff's account would have a <u>negative</u> balance of $2,317,875 ($2.3 million) on an account that had a margin requirement of approximately $113,470 when the auto-liquidation commenced. Something is clearly wrong with Defendants' Auto-Liquidation Software.

6.      Defendants ask this Court to approve the result described in Paragraph 5 as a matter of law.

Jurisdiction

7.      This is a Class action brought by Plaintiff individually and on behalf of the "Class" as defined in ¶ ¶112 – 114 below.[2] Jurisdiction in this

_____

2 Throughout this Complaint Plaintiff sometimes cross references other paragraphs. This is to bring to attention certain pleadings particularly relevant to the point to which the cross reference applies, for the convenience of the parties

Court is proper under the Class Action Fairness Act of 2005 ("CAFA") and pursuant to 28 U.S.C §1332 because:

    a.    This is a civil action filed pursuant to Fed. R.Civ. P. 23 brought by one or more representative persons as a Class action, with minimal diversity between the parties;

    b.    The amount in controversy of all Class members in the aggregate exceeds the sum or value of $5,000,000.00, exclusive of interest and costs;

    c.    The members of the putative Class are citizens of all 50 states, including states that are not the State of citizenship for IB; and

    d.    All other factual conditions precedent necessary to empower this Court with subject matter jurisdiction and personal jurisdiction are satisfied.

Venue

8.    Venue is proper in this Court pursuant to 28 U.S.C. *§* 1391 because IB and IBG have their principal office and headquarters in this district, all Defendants reside in this district, all Defendants are subject to personal jurisdiction in this district, and a substantial number of the transactions at issue in this action occurred in this district.

---

and Court. But the cross reference does not limit or exclude other pleadings herein that are relevant to the point.

Parties

9.      Plaintiff, Robert Scott Batchelar, is, and at all times herein referenced was, an individual residing at 67 Dunster Drive, Stow, MA 01775, and is a citizen of the State of Massachusetts.

10.     Interactive Brokers, LLC ("IB") is, and at all times herein referenced was, a limited liability company formed in the State of Connecticut. IB is a citizen of the State of Connecticut and may be served by serving its registered agent: IBG LLC, One Pickwick Plaza, Greenwich, Ct., 06830. IB has appeared.

11.     Interactive Brokers Group, Inc ("IBG") is, and at all times herein referenced was, a corporation formed in the State of Delaware. IBG is headquartered in and is a citizen of the State of Connecticut and may be served by serving its registered agent: Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington DE 19808. IBG has appeared.

12.     Thomas A. Frank ("Frank") is a natural person residing in the state of Connecticut and may be served by serving him at his office located at One Pickwick Plaza, Greenwich, Ct, 06830. Frank has appeared.

Factual Allegations

IB's Business

13.   IB is an online deep-discount broker-dealer. IB executes orders for exchange listed securities, as well as options, futures, futures on options, and foreign currency exchange trades.

14.   IB is in the business of executing investment trades for its customers, at the direction of its customers. IB does not recommend any particular security, investment, or investment advisor.  IB does not recommend any particular trading strategy, or even whether the client should trade at all.  IB serves as the conduit connecting buyers and sellers to the various exchanges. IB is what is known in the industry as a "non-discretionary broker."

15.   Incident to its business, IB offers margin accounts by which an IB customer can purchase and sell positions which are secured by the collateral in the customer's account.

16.   A margin account allows customers to purchase or sell additional positions beyond what would be possible in a cash account. The margin requirement in an IB margin account is determined by a calculation that is part of the software used by IB.

17.   IB uses proprietary software to execute its customers' orders on the various exchanges.

6

18.     **IB's business provides a type of service that is of great practical importance and necessity for members of the public who are IB's customers.**

19.     **IB holds itself out as willing to perform this service to members of the public who meet IB's standards.**

Plaintiff and Defendants' Business Relationship

20.     **There is a contract between IB and Plaintiff. Although Plaintiff is known to IBG and Frank as a member of the group of "customers" that are served by IBG and Frank to the benefit of IB, there is no contract between IBG and Plaintiff and no contract between Frank and Plaintiff.**

21.     **In his dealings with IB prior to IB taking control of Plaintiff's account during the liquidation event herein described, Plaintiff acted in the capacity of an investor making his trades through IB, his non-discretionary broker.**

22.     **Plaintiff and the Class placed their positions under the control of IB.**

23.     **IB possessed and possesses a decisive bargaining advantage over Plaintiff and the Class.**

Plaintiff's Investment

24.    **The type of investment that Plaintiff held in his IB account is called an "SPX put option." These are not securities represented by shares or bonds, but are referred to as "contracts" or more generically "positions."**

25.    **The underlying value of an SPX put option is determined by the Standard and Poor's stock index ("S&P 500"). As the S&P 500 gains value, the SPX put options lose value.  Plaintiff was "short" these options, which means that in order to liquidate the position, Plaintiff must buy the options back.**

26.    **The key is this: Unlike traditional stock trades, the lower the price at which his SPX put options were liquidated, the better for Plaintiff and the higher the price the worse for Plaintiff. As a hypothetical example, a trade at $3.00 would be better for Plaintiff than a trade at $10.00.**

The Liquidation of Plaintiff's Account

IB's Auto-Liquidation Software

27.    **In the remainder of this Complaint, to avoid stilted prose, the terms "auto-liquidation algorithm," "auto-liquidation program," "Auto-Liquidation Software," "algorithm", "program" and "software" and like terms are used interchangeably and all have the meaning assigned to Auto-Liquidation Software in footnote 1 of this Complaint.**

28.   IB's and IBG's core software technology is developed internally. IB and IBG do not generally rely on outside vendors for software development or maintenance. IB and IBG are continuously rewriting and upgrading software.  IB and IBG are technology-focused, and their management team is hands-on and technology-savvy. They tout their technology prowess to existing and prospective customers.

29.   Most members of the IB and IBG management team write detailed program specifications for new applications. The development queue is prioritized and highly disciplined. Progress on programming initiatives is generally tracked on a weekly basis by a steering committee consisting of senior executives.

30.   On information and belief, the writing, developing, testing, maintenance and tracking of the auto-liquidation algorithm is Frank's responsibility.

31.   Year after year, in official SEC filings, filed under oath, Defendants explained the purpose of the Auto-Liquidation Software, stating that the Auto-Liquidation Software *was to protect IB's customers* as well as IB.

32.    In SEC filings Defendants explained: "We calculate margin requirements for each of our customers on a real-time basis across all product classes (stocks, options, futures, forex, bonds and mutual funds) and across all currencies. Recognizing that our customers are

9

experienced investors, we expect our customers to manage their positions proactively and we provide tools to facilitate our customers' position management. However, if a customer's equity falls below what is required to support that customer's margin, we will automatically liquidate positions on a real-time basis to bring the customer's account into margin compliance. We do this to <u>protect</u> us, *as well as <u>the customer, from excessive losses</u>*. These systems further contribute to our low-cost structure. *The entire credit management process is completely automated*." (Emphases added). E.g. Form 10-K dated February 26, 2016, for year ending December 31, 2015, page 13. This statement is repeated in SEC filings going back to IB's initial registration in 2006 and is repeated in IB's most recent SEC 10-K for the year ended December 31, 2017.

33. The Chairman, Chief Executive Officer and Chief Financial Officer each certified: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Form 10-K Exhibits 31.1 and 31.2.

34.  IB has made materially the same statements on its public website, including a statement that its "automated risk controls" contribute to protecting "our clients from large trading losses."

IB Used its Auto-Liquidation Software to Liquidate Plaintiff's Account

35.  Plaintiff's margin account was liquidated by IB, using the flawed auto-liquidation algorithm described in detail in ¶¶ 55-62 and Exhibit A.

36.  As more particularly pleaded below in ¶¶ 55-62 and Exhibit A. IB's auto liquidation software determined that Plaintiff had a margin deficiency.

37.  The software compares the margin account requirement (also referred to as the collateral requirement) to the net liquidating value (NLV) of the margin account.

38.  If the NLV of a client's margin account is less than the margin requirement, a margin deficiency is declared by the software and the client's margin account is subjected to the auto-liquidation algorithm.

39.  "Margin deficiencies" and "margin calls" are viewed by the industry, and contemplated by the regulations, as a normal part of the margin-lending process.

40.  The IB Customer Agreement with Plaintiff states that IB "has the right, in its sole discretion, <u>but not the obligation,</u> to liquidate all or any part

11

of a customer's position in any of the [customer's accounts]." (Emphasis added).  Thus, IB has no contractual obligation to liquidate.  IB voluntarily elected to liquidate Plaintiff's account prior to issuing a margin call. Plaintiff was not in violation of margin requirements under FINRA rules or federal law.

41.    The proprietary software used by IB, however, is designed to function in lieu of margin calls. IB's auto-liquidation process is entirely automated and requires no human intervention.

42.    Liquidation by IB's Auto-Liquidation Software is <u>not</u> an orderly process of a margin call, action or non-action by the customer, a default, and a close-out of positions in the account until the margin requirement is cured, with IB employees making judgments at each step.

43.    Nor, once triggered, is IB's auto-liquidation process the product of IB's business judgment or IB's discretion, or IB's evaluation of the commercial justification for the trades, or evaluation or fear of risk.

44.    In fact, on information and belief, based on Plaintiff's experience of his liquidation and post-liquidation communications with IB, there was no human involvement at all once the liquidation of Plaintiff's account began. Rather there is an unintended and unreasonable design, coding, programming, testing or maintenance error as detailed in ¶¶55-62, 66, 69-77 and, and Exhibit A.

45.     During an auto-liquidation, IB's software assumes control over the account and restricts trading by Plaintiff.

46.     Once commenced IB's Auto-Liquidation Software restricts the customer from liquidating their own account to cure the margin deficiency. Customers like Plaintiff are restricted from generating new orders and the program cancels pending orders previously entered by the customer.

47.     When IB's auto-liquidation algorithm was triggered, Plaintiff was not in breach of any federal rules or regulations concerning margin and had fully performed his responsibilities under applicable federal rules and regulations.

48.     IB liquidated Plaintiff's account mid-morning, shortly after IB's software determined that there was a margin deficiency. IB's Auto-Liquidation Software employs a proprietary algorithm which identifies positions for liquidation.  The exact time of the trades is charted on Exhibit A, attached hereto and incorporated herein by reference.

49.     The fact that IB's Auto-Liquidation Software automatically began to liquidate when it determined there was a margin deficiency meant that Plaintiff had complied with his margin requirements and was in good standing with IB up until a margin deficiency was determined by IB's software.

13

50.    This liquidation was not required by law. The controlling rules,
Regulation T and FINRA Rule 4210 do not even consider there to be a
"margin deficiency" unless the end-of-day value of an account is less
than the margin requirement. So, Plaintiff did not have a margin
deficiency, as defined under the rules, when the liquidation
commenced. Furthermore, FINRA Rule 4210 explicitly permitted
Defendant three business days before requiring a liquidation in the
type of margin account held by Plaintiff.

51.    FINRA 4210 (g) (10) addresses a portfolio margin deficiency as
follows: "If, as of the close of business, the equity in the portfolio
margin account of an eligible participant, as described in paragraphs
(g)(4)(A) through (g)(4)(C), is less than the margin required, the
eligible participant may deposit additional funds and/or securities or
establish a hedge to meet the margin requirement within three
business days." Regulation T is to the same effect regarding end of
day margin determinations; to wit: "All transactions on the same day
shall be combined to determine whether additional margin is required
by the creditor." 12 CFR 220.4(c)(1).

52.    IB made the voluntary decision to have its software check margin
requirements on a continuous basis and automatically liquidate
under-margined customer portfolios at times other than required by
the federal rules and regulations, to, in IB's words: "protect us, as

well as the customer, from excessive losses."  Thus, not only did IB
have no contractual obligation to liquidate as and when it did, IB also
had no regulatory obligation to liquidate as and when it did.  Instead,
IB, IBG and Frank each took actions voluntarily; the purpose of which
voluntary actions was to protect IB's customers and IB from
excessive losses.

53.     Paragraphs 55-62 and Exhibit A describe the actual liquidation of
Plaintiff's account. During an auto-liquidation, IB software takes
control of a customer's account and makes trades on behalf of the
customer, with the customer's funds, purportedly to satisfy the
margin requirements and reduce the risk of loss for both the
customer and IB.

54.     When IB's flawed auto-liquidation algorithm declared a margin deficit
in Plaintiff's account on the morning of August 24, 2015, IB's Auto-
Liquidation Software then began to close-out Plaintiff's positions, by
buying back, Plaintiff's options.


The Liquidation Trades

    The 51 Liquidation Trades Made by the Auto-Liquidation Software

55.     At 10:11:15 a.m., IB's computer began liquidating Plaintiff's account.
The liquidation ended at 10:31:37 a.m. on that same morning.

56.    In those approximate 20 minutes, IB's computer made fifty-one auto-liquidation trades in the exact same contract (i.e. same investment type) at prices that varied 1,568% from low to high ($5.00 / $83.40). Because of the programming flaw in IB's Auto-Liquidation Software summarized at ¶¶55-62,66, 69-76 and Exhibit A, Plaintiff's account suffered greater losses than it would have had the code been written, tested and maintained properly and reasonably. Recall, for Plaintiff's positions in SPX put options, a lower price for a trade is better for Plaintiff than a higher priced trade.

57.    The effect of the flaw is illustrated in ¶¶ 58 — 60 by a seven (7) second example, during which eight of the fifty-one liquidation trades were executed during the August 24th liquidation:

58.    At 10:23 and 12 seconds, 5 option contracts traded at a price of $5.80 per contract to a market participant other than Plaintiff.

59.    At 10:23 and 19 seconds, IB's Auto-Liquidation Software executed a series of duplicative market orders as part of liquidating Plaintiff's account. These orders, upon routing to the exchanges, were executed at $7.00, $7.00, $9.00, $10.00, $10.60, $11.30, $16.00, and $83.40 per contract, an increase of 1,337% over the market price paid by the preceding third-party just seven (7) seconds before. See Exhibit A.

60.    At 10:23 and 41 seconds, once that burst of liquidation trades were executed, the next transaction price for market participants other than

16

<u>Plaintiff reverted to $5.75 per contract</u>, followed by another transaction at $5.70, just 17 seconds later. See Exhibit A.

61.    <u>All</u> of the liquidation trades are charted on Exhibit A. Exhibit A charts the time and price of each liquidation trade, as well as the time and market price paid by third-parties for the same position during the entire liquidation period.

62.    The underlying S&P Index, which traders use to derive the fair market value of the option in this example of the liquidation trades of Plaintiff's account, varied less than 1.2% during the 20 minute time period of the liquidation (See Exhibit A), whereas the liquidating trades of Plaintiff's account varied more than 1,568% over the same time period.   IB's flawed auto-liquidation algorithm not only permitted these liquidation trades, the software caused the artificial, greater than fifteenfold, increase in the prices paid during the liquidation period.

63.    Plaintiff complains that these trades or transactions were at prices that hurt Plaintiff and reflect an underlying flaw in the Auto-Liquidation Software that, in the exercise of due care, should have been avoided.

64.    IB voluntarily implemented its auto-liquidation algorithm as an additional measure of security designed to go above and beyond the contract with Plaintiff, as well as the regulatory requirements, in

17

protecting its customers and itself from losses.  Unfortunately, the flaw in the algorithm caused it to fail to meet its goal and applicable standards of care.

65.     IB has never claimed that its auto-liquidation program is intended to automatically increase the margin deficiency or increase risk for customers or IB. That the program does so is the result of negligent design, coding, testing and maintenance.

The Flaws in IB's Auto-Liquidation Software

66.     Paragraphs 55-62, 69-76, and Exhibit A identify software flaws in the auto liquidation software.

67.     The Auto-Liquidation Software is not available to Plaintiff and is peculiarly within the possession and control of the Defendants. Upon examination of the code and other documents in the possession, custody, or control of IB, when produced later in discovery, more than a single design, coding, programming, testing or maintenance error may contribute to the flaw. The flaw is the negligent absence or defective market and risk controls in the liquidation algorithm, as pleaded below in more detail.  Multiple elements may work together in synergy to create the root cause of the flaw.

68.     Defendants have exclusive access to the source code for the Auto-Liquidation Software and Plaintiff does not have access to it. Plaintiff

18

and Plaintiff's experts have access to IB's trading reports for
Plaintiff's account and trading reports of other IB customers. Based
on examination of trading reports available to Plaintiff and experts
and based on opinions of experts regarding the results shown on
Exhibit A, on information and belief, Plaintiff believes that the flaw
operates as described in ¶¶ 35-46 and 69-76.

69.     Industry standards require that trading software used for liquidation
        trades incorporate automated market and risk controls into their
        liquidation algorithms.

70.     The program flaw is that IB's Auto-Liquidation Software omits or
        inefficaciously implements industry standard market risk controls. On
        information and belief, the flaw in IB's Auto-Liquidation Software
        consist of several missing or faulty elements of design, coding,
        testing and maintenance; the deficient software, code, algorithm
        element, or sub-routines being (¶¶ 71-76):

71.     Failing to implement (or faulty implementation of) industry standard,
        pre-trade risk controls designed to prevent erroneous trades;

72.     Generating account valuations based on erroneous trade prices,
        versus actual, market value;

73.     Generating orders based on hypothetical market data that
        substantially differs from the actual market prices and liquidity

reflected in the market at the time each liquidation order is generated and routed for execution;

74.    Failing to include programming instructions to impose price "caps" or "floors" on auto-liquidation orders, which would ensure that trade prices of such orders do not deviate from the market price at the time the order is generated and routed for execution by more than a pre-defined percentage;[3] and

75.    Generating orders that ultimately execute at prices which result in a "liquidation value" of less than 1 as calculated by the program at the time the order was generated.[4]

_____

3 Properly programmed, such caps and floors would prevent erroneous executions while adjusting to the market on an order-by-order basis so as to protect the account and customer from a deteriorating market.  Protection of the customer and IB was the intent announced by Defendants when they voluntarily undertook to develop, and voluntarily continued to modify, test and maintain the Auto-Liquidation Software.

4 The "liquidation value" is a ratio, calculated by the program at the time each auto-liquidation order is generated, in which the "liquidation value" equals the expected "margin gain" of a trade (how much the trade will reduce the margin deficiency) divided by the "cost to liquidate" the position (difference between the most favorable market price and the price at which the customer's position is valued by the broker). If the liquidation value is greater than 1, the liquidating trade will reduce the customer's margin deficiency, helping to restore the customer's margin compliance. If the liquidation value is less than 1, the liquidating trade will increase

76.   **In sum, the flaw in the Auto-Liquidation Software (whether caused by design, coding, testing, maintenance (or some combination of design, coding, testing or maintenance) can unreasonably make an IB customer's margin deficiency worse, not better and can cause liquidation trades to be made at artificial non-market prices.**

77.   **As a result, in Plaintiff's and the class members' accounts losses and risks were increased, instead of reduced, and neither the Defendants nor Plaintiff were benefitted by a reduction of risk or protected from excessive losses.  To the contrary, all are victims of the programming flaw.**

## Damages

78.   **Plaintiff's margin account was liquidated by IB, using the flawed auto-liquidation algorithm. Plaintiff was damaged thereby. The damage is charted on Exhibit A.**

79.   **If Plaintiff's account had been liquidated at the _average_ third-party market price of $5.38 prevailing over the period during which Plaintiff's account was liquidated, Plaintiff's account would have been**

---

**the customer's margin deficiency. In other words the Auto-Liquidation Software <u>erroneously</u> determines that a Liquidation Value is equal to or greater than 1 <u>when</u> the true execution L Value is less than 1. This is an error that erroneously, negligently, and unintentionally increases the margin deficiency.**

closed with a _positive_ balance of $30,527. If Plaintiff's account had been liquidated at the _worst_ third-party market price during that period of $6.00, Plaintiff's account would have been closed with a _positive_ balance of $11,865.

80. Yet the flaw in IB's auto-liquidation program created a _negative_ balance of $83,280.

81. The auto-liquidation algorithm created an excessive loss in Plaintiff's account of between $95,145 and $113,807.

82. Had IB liquidated all of Plaintiff's position in the worst of the 51 liquidation trades its software executed, then Plaintiff's account would have a claimed _negative balance of $2,317,875,_ o_n an account that had a margin requirement of only approximately $113,470_ when the auto-liquidation commenced.

83. Defendants have not claimed that IB intended that the liquidation of Plaintiff's account would make the margin deficiency worse, not better.

84. Once Plaintiff identified himself and complained about the auto-liquidation software flaw, IB had direct access to all the records of Plaintiff's trading and, most directly, to the records of the liquidation of his account and of his complaint to IB. IB also has access to the Auto-Liquidation Software. So Defendants had at all times knowledge

of the trade, the software flaw's adverse impact on Plaintiff and Plaintiff's loss.

85.    The putative class members' margin accounts were liquidated by IB, using IB's flawed auto-liquidation algorithm. The putative class members were damaged thereby.

## Responsibility for IB's Auto-Liquidation Software

86.    The Auto-Liquidation Software is designed, coded, developed, tested, and maintained internally by Defendants.

87.    Frank is the Chief Information Officer and Executive Vice President of IBG. Frank is responsible for the development and maintenance of IB's trading, processing, and communications systems. Frank wrote or is responsible for the functioning of the auto-liquidation algorithm at issue in this case.  Frank through action or inaction has negligently caused or permitted the auto-liquidation algorithm to exist in its flawed condition.

88.    Dr. Frank knew the software's intended purpose and the fact the software would be used to liquidate collateral in customer's accounts.

89.    IBG is the manager and owns less than 16% of IB and is the employer of Frank.  IBG hired Frank to ensure proper functioning of the auto-liquidation algorithm and has allowed Frank to remain in his job.

CAUSE of ACTION

Negligence

Foreseeability

90.     Once executed, software can only fail because of faulty design, coding, testing or maintenance (or combination thereof). That Defendants' Auto-Liquidation Software failed so spectacularly is, in and of itself, evidence of negligence in its design, coding, testing and maintenance.

91.      An ordinary person in the Defendants' position, knowing what the Defendants knew or should have known, would anticipate that harm of the general nature suffered by Plaintiff and the class was likely to result.

92.     Defendants knew or should have known, and it was foreseeable to Defendants, that if there was a programming flaw in its Auto-Liquidation Software as pleaded above, it would cause damage and harm to Plaintiff and customers like Plaintiff of the general nature suffered by Plaintiff and the class.

93.     Of course, because Frank was personally responsible for the design, development, testing and maintenance of the Auto-Liquidation Software, he owes a personal duty and faces personal liability irrespective of his status as an employee or officer of IBG.

24

94.    Plaintiff and the Class were in fact damaged by this negligence.

95.    The breaches of duty that damaged Plaintiff would not have occurred
       but for these Defendants' negligence. The auto-liquidation algorithm
       was within the Defendants' exclusive custody and control. Plaintiff
       did not voluntarily contribute to the events and damages of which
       Plaintiff complains.

## Frank's Negligence

96.    In addition to the facts pleaded elsewhere herein, Frank did not
       exercise that degree of care in designing, coding, testing, maintaining
       and approving the Auto-Liquidation Software, and supervising others
       to do the same, which a skilled professional of ordinary prudence
       would have exercised under the same or similar conditions. Summary
       Order @5.

## IB Negligence

97.    In addition to the facts pleaded elsewhere herein:

98.    Interactive Brokers, LLC negligently performed its contract with
       Plaintiff. Summary Order @3.  Liquidation by a completely automated
       computerized Auto-Liquidation Software program is neither
       permitted, required, or prohibited by IB's contract with Plaintiff and
       the class members.

99.   Further, even though Interactive Brokers, LLC disputes that it owes a contractual duty to Plaintiff to minimize losses on liquidation, it has admitted that it has assumed an extra-contractual duty to protect customers from excessive losses. See ¶¶ 31 - 34.

100.   Even had there been no contract, the duties pleaded herein to be owed by IB to Plaintiff and the class would apply. Thus, both the decision to liquidate and liquidation by use of automated computerized Auto-Liquidation Software  are voluntary.

101.   When IB undertook to liquidate Plaintiff's account by Auto-Liquidation Software IB was under a duty to exercise that degree of care which a skilled non-discretionary broker of ordinary prudence would have exercised under the same or similar conditions. IB breached this duty of care by using the flawed Auto-Liquidation Software.

102.   Cumulatively and alternatively, IB has liability derivative of Frank's liability. Summary Order @6.

## IBG's Negligence

103.   In addition to the facts pleaded elsewhere herein, IBG's liability is derivative of Frank's liability. Summary Order @6.

The Defendants Have a Duty to Act Reasonably

**104.**   **For many years software engineering and maintenance standard groups such as ISO (International Organization for Standardization), IEC (International Electrotechnical Commission), IEEE (Institute of Electrical and Electronics Engineers) and ANSI (American National Standards Institute) have established software standards.**

**105.**   **Further, regulators establish standards of due care, such as SEC Rule 15c3-5 and FINRA Notice 15-09.**

**106.**   **Private experts have long published best practices for software design, coding, testing and maintenance of software.**

**107.**   **In private arbitrations (where most securities disputes are resolved), negligence is a recognized standard.**

**108.**   **Further, all brokers like IB have a policy and procedure for correcting errors and mistakes (known as "Trade Errors"), by which a broker may petition an exchange for rescission or price adjustment of erroneous trades and customers are reimbursed for negligent errors.**

**109.**   **The expectation of all parties is that mistakes and errors will be corrected.**

## Request for Declaratory Relief

**110.  Plaintiff and the Class request a declaration under the terms of the contract between them and IB that they are not liable for any increase in margin deficiency caused by an error executed by the Auto-Liquidation Software.**

## Request for Injunctive Relief

**111.  If IB is permitted to collect or attempt to collect any increase in margin deficiency caused by an error executed by the auto-liquidation algorithm and is permitted to take action thereon that has an adverse impact on Plaintiff's and the Class' credit rating and score, Plaintiff and the Class will suffer likely and imminent injury that is not capable of being fully remedied by money damages. Plaintiff and the Class request a permanent injunction that enjoins IB from collecting or attempting to collect any increase in margin deficiency caused by an error executed by the Auto-Liquidation Software, or to cause any adverse impact on Plaintiff's and the Class' credit rating and score.**

## Class Allegations

**112.  Unless otherwise specifically stated herein, and pursuant to Fed. R. Civ. P. 23, this action is instituted by the Plaintiff on behalf of himself and all other similarly situated persons, as representative of the following "Class":**

113. All United States residents who at any time from 12/18/2013 to date of trial had margin accounts with IB, which accounts had trades conducted by the Auto-Liquidation Software, except for persons specifically excluded as follows.

114. Specifically excluded from the Class are:

A. Federal judges who preside or have presided over this case;

B. The staff of federal judges who have presided over this case;

C. The immediate family of federal judges who have presided over this case;

D. Persons employed by any of the Defendants;

E. Persons employed by any of the affiliates of any of the Defendants;

F. Attorneys for any Defendant and other lawyers in those lawyer's firms and the immediate family of those attorneys;

G. Attorneys for Plaintiff or the Class and other lawyers in those lawyer's firms and the immediate family of those attorneys; and

H. Persons who have litigated or arbitrated their claims related to liquidation of their margin account.

115. The Class includes putative Class members residing throughout the United States, and includes hundreds if not thousands of members, and therefore the Class is so numerous that joinder of all members of the Class would be impractical.

116. The claims for relief asserted herein on behalf of the Plaintiff and the putative Class members present questions of law and fact common to the Class.

117. The claims of the named representative Plaintiff are typical of the claims of the putative Class.

118. The Plaintiff, as the representative Plaintiff for the putative Class, will fairly and adequately protect the interests of the putative Class because:

A. The Plaintiff has knowledge regarding the facts and circumstances that give raise to his claims and the claims of the putative Class members;

B. The Plaintiff is strongly interested and highly motivated to assert and protect his own rights and the rights of the putative Class in a vigorous fashion;

C. The Plaintiff has retained Class counsel with substantial experience and expertise in class actions, commercial litigation and litigation in prior cases for the same or similar practices complained of

30

in this Complaint. Also, putative class counsel has the necessary and requisite resources to appropriately prosecute this case;

D.  Putative Class counsel will vigorously assert and protect the interests of the putative Class members; and

E.  There is no antagonism or conflict between the claims asserted by Plaintiff and the claims of the Plaintiff Class.

119.  The questions of law and fact common to the Plaintiff and the putative Class members predominate over any questions affecting only individual members of the Class, and a Class action as asserted herein is superior to other available methods for the fair and efficient adjudication of this controversy, in that, among other elements:

A.  The interests of the Plaintiff and the interests of individual Class members in controlling the prosecution of separate actions are outweighed by the advantages of adjudicating the common issues of fact and law by means of a Class action;

B.  Upon information and belief, there are no pending certified Class actions concerning the controversy at issue or the claims asserted in this case applicable to the Plaintiff or the putative Class members set forth herein;

C.  Concentrating litigation of these claims in this forum is desirable because it will prevent and avoid a duplication of effort and the

31

possibility of inconsistent results, and this forum represents an appropriate forum to settle the controversy based on the location of the Plaintiff, the putative Class members, the fact that IB does substantial business in this jurisdiction, and the availability of witnesses and evidence;

D.  Any difficulties that may be encountered in management of the Class are greatly outweighed by the difficulties of handling multiple actions by individual Class members; and

E.  This Class action is a superior method because it furthers judicial economy and efficiency and is in the best interests of the Plaintiff and the putative Class members.

120.   Certification of the Class is also appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

Prayer

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For judgment for all losses and damages that have been, or will be, sustained;

2.    Actual damages;

32

3.      For reasonable attorneys' fees and costs;

4.      For the requested declaration;

5.      For the requested injunctive relief; and

6.      For such other and further relief as the Court deems just and

equitable.

# Plaintiff demands a trial by jury.

Respectfully submitted,

/s/ _____

Gary N. Reger (TSB No. 16733200)          William M. Bloss (ct01008)
Orgain, Bell and Tucker, LLP              KOSKOFF, KOSKOFF & BIEDER,
207 San Jacinto Blvd., Suite 301          P.C.
Austin, TX 78701                          350 Fairfield Avenue
Tel: (512) 861-0441                       Bridgeport, CT 06604
Email: gnr@obt.com                        Tel: (203)336-4421
                                          Fax: (203)368-3244
Larry DeWayne Layfield (TSB No. 12065710)  Email: bbloss@koskoff.com
Law Office of L. DeWayne Layfield, PLLC
P.O. Box 3829
Beaumont, TX 77704
Tel: (409) 832-2109
Email: dewayne@layfieldlaw.com            Counsel for Plaintiff



## Auto-Liquidation of Scott's S&P Options — The Higher the Price, the Worse for Scott

JA 258

## CERTIFICATION OF SERVICE

I hereby certify that on the 30th day of November, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

BY: /s/_____

William M. Bloss